**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION**

**FREDDIE LEE PARKER**                                               **PLAINTIFF**

**v.**                                      **CIVIL ACTION NO.:5:13-cv-0054-DCB-MTP**

**CAROLYN W. COLVIN**
**Acting Commissioner of Social Security Administration**                       **DEFENDANT**

## REPORT AND RECOMMENDATION

Plaintiff Freddie Lee Parker ("Parker") brings this action pursuant to 42 U.S.C. § 405(g) and U.S.C. § 1383(c)(3) seeking judicial review of a final decision of the Acting Commissioner of Social Security Administration denying his claim for disability insurance benefits and supplemental security income.  The matter is now before the Court on the Complaint [1], Plaintiff's Brief [9], and Defendant's Motion to Affirm the Commissioner's Decision [10]. Having considered the pleadings, the record and the applicable law, and being fully advised in the premises, the undersigned recommends that the Acting Commissioner's decision be AFFIRMED IN PART AND REMANDED IN PART, consistent with this Report and Recommendation.

## PROCEDURAL HISTORY

On July 1, 2010, Plaintiff applied for a period of disability, disability insurance benefits ("SSD") and supplemental security income ("SSI") under the Social Security Act, alleging disability as of March 1, 2009, primarily due to diabetes, eye problems, right hand impairments, high blood pressure, high cholesterol, cramps, feet problems, gout and ulcer(s).  (Administrative

Record [8] at pp. 58-60 and 63-64).[1]  Plaintiff's claim was denied initially and upon

reconsideration. ([8] at pp. 42-46 and 37-41).  Thereafter, he requested a hearing before an

Administrative Law Judge ("ALJ").  ([8] at pp. 29-30).

On March 5, 2012, a hearing was convened before ALJ Laurie H. Porciello.  The ALJ

heard testimony from the Claimant and Ms. Burg, a vocational expert ("VE").  ([8] at pp. 255-

297).  The Claimant's medical history was presented through the medical records and Mr.

Parker's testimony.  The medical issues for which he claimed disability, were revised to

"diabetes accompanied by neuropathy, anxiety, hypertension and gout," the neuropathy allegedly

causing pain in his hands and feet.  ([8] at p. 260).  On June 18, 2012, the ALJ issued a decision

finding that Plaintiff was not disabled. ([8] at pp. 12-22).   The Claimant appealed the ALJ's

decision ([8] at p. 11); and, on February 4, 2013, the Appeals Council denied review, rendering

the ALJ's decision final.  ([8] at pp. 7-10).

Aggrieved by the Acting Commissioner's decision to deny benefits, Plaintiff filed a

Complaint in this Court on April 4, 2013, seeking a determination that he is entitled to disability

benefits, or a remand of the matter, and other relief.  (Complaint [1] at p. 2).  The Acting

Commissioner answered the Complaint, denying that Plaintiff is entitled to any relief.  (Answer

[7]).  The parties having briefed the issues in this matter pursuant to the Court's Order [5], the

matter is now ripe for decision.

## MEDICAL/FACTUAL HISTORY

Plaintiff was born on December 26, 1957; he was fifty-four years old at the time of his

---

[1] For ease of reference, the administrative record is cited to herein by reference to the Court's docket number and docket page number in the federal court record (not the Administrative Record page number).

hearing before the ALJ in February 2012.  ([8] at pp. 260-261).  His alleged disability onset date

was March 1, 2009, when he was fifty-one years old. ([8] at pp. 21and 60).  Plaintiff has an

eleventh grade education; in 1988 he began working on a road crew for the Adams County Board

of Supervisors.  At some point during his tenure with Adams County, he also served as a litter

crew supervisor.   For reasons unrelated to his health, Mr. Parker was terminated from his

employment on or about May 10, 2009.  ([8] at pp. 65, 263 and 265-267).  Nevertheless, Plaintiff

alleges that he is disabled due to diabetes mellitus, hypertension, impaired vision, kidney

problems, anxiety, obesity, neuropathy, gout, and pain in his feet, hand and side.  ([8] at pp. 64,

260 and 268-270).

Plaintiff began treating with physicians at Jefferson Comprehensive Health Center, Inc. in

Fayette, Mississippi ("Jefferson Health Center")[2] on or before April 3, 2008.  He had symptoms

of dizziness and needed a check up concerning diabetes mellitus.  His medications were noted;

and he was assessed has having diabetes mellitus, hypertension, dizziness and an ingrown

toenail, which was removed that day.  Labwork was ordered, including tests to measure his uric

acid, lipids and blood sugar levels, among other things.  His blood pressure was 129/74.  Mr.

Parker was to return to the clinic in a week, and notes indicate he either wore or was to buy

diabetic shoes.  ([8] at p. 187).

He followed up a week later, reporting no problems, at which time his blood pressure was

146/84.  ([8] at p. 184).  On September 18, 2008, he returned for a check up.  His toe was

infected, and he reported recent headaches. His blood pressure was 142/88.  His blood sugar

---

[2]Jefferson Health Center is an FTCA Deemed Community Health Center, a grantee under
42 U.S.C. 254b, and a Deemed Public Health Services employee under 42 U.S.C. (g)-(n).
https://www.jeffersoncomprehensivehealthcenter.com/index/php (last visited June 4, 2014).

3

levels were under control.  Diagnoses included diabetes, hypertension and gout.  He was also scheduled for a colonoscopy due to blood in his stool.  ([8] at pp. 184-185).[3]

Records from Riverpark Ambulatory Surgery Center and Tillman Medical Group from September 2008 indicate that his colon was healthy.  Nevertheless, the history he gave is noteworthy, as is his labwork.  He reported having diagnoses of diabetes, hypertension and gout, for which he took four medications:  allopurinol; glimepiride; metformin; and quinapril hydrochloride.[4]  He denied having vision problems, chest pain, fainting, peripheral edema, shortness of breath, joint pain, arthritis, muscle pain and anxiety, among other things.  ([8] at pp. 210-212).  His BUN and creatinine levels were elevated.[5]  ([8] at p. 214).

Mr. Parker returned to Jefferson Health Center on February 19, 2009, complaining of a painful, swollen ankle after having eaten T-bone steaks.  He also need a check up on his diabetes; his fasting blood sugar at home was 142.  Labwork showed controlled diabetes,[6] and his ankle

---

[3]The notes are hand written and difficult to read in places.  It appears he was prescribed an antibiotic and an antihistamine, in addition to his regular medications.  ([8] at pp. 184-185).

[4]Allopurinol is for the treatment of gout; glimepiride and metformin are used to treat type 2 diabetes.  http://www.nlm.nih.gov/medlineplus/druginfo/meds (last visited June 23, 2014).  Quinapril hydrochloride is used in the treatment of hypertension.  http://www.rxlist.com/accupril-drug.htm (last visited June 23, 2014).

[5]BUN and creatinine are evaluated to determine how well one's kidneys are working.  If elevated, these indicate likely decreased kidney function.  http://www.riversideonline.com/health (last visited June 23, 2014).  The normal syrum creatinine level for men is 0.5-1.5, and normal BUN level for adults ranges from 7-20.  http://lifeoptions.org/kidneyinfo/labvalues.php (last visited June 23, 2014).

[6]His hemoglobin A1c level was 6.6%.  ([8] at p. 181).  The hemoglobin A1c test is an important blood test for measuring how well diabetes is controlled.  It measures blood sugar control over a six-to-twelve week period, and is useful in conjunction with home blood sugar tests to make adjustments in diabetes medications.  For people with a diabetes diagnosis, the goal is a hemoglobin A1c less than under 7.0%.  http://www.webmd.com/diabetes/guide/glycated-

was tender, warm and swollen.  Colchisine[7] and lortab were added to his medication regime; allopurinol was refilled at the same dosage.  ([8] at pp. 181-182 and 211).

Two months later, on April 21, 2009, Mr. Parker returned to Jefferson Health Center complaining of generalized headaches for a few days, and stated he was under a "great deal" of stress.  His blood pressure was 163/106.  In addition, his fasting blood sugar was elevated at 246 at home; and insulin 70/30, twenty-five units daily, was added to his treatment plan.  Mr. Parker's physician diagnosed him with anxiety/headaches in addition to diabetes, hypertension and gout, and recommended tapering his insulin by 5 unit increments with a goal of maintaining his fasting blood sugar at approximately  100.  ([8] at pp. 180-181).

Mr. Parker returned on September 28, 2009, with right hand pain and swelling.  His blood sugar was 154, and his blood pressure was 158/94.  On physical examination of Mr. Parker's hand and wrist, his physician noted diffuse swelling with tenderness, slight increased warmth and that Mr. Parker was unable to make a fist.  Although the notes are somewhat illegible, it appears Mr. Parker had been seen by another physician in Natchez who had prescribed one or more medications, including naproxen 500 milligrams twice daily.[8]  His doctor in Fayette assessed acute gouty arthritis, continued him on naproxen, allopurinol and colchisine, and added Lorcet

---

hemoglobin-test-hba1c (last visited June 23, 2014).

[7]Colchicine is used to relieve acute gout attacks, but it does not treat or lower elevated levels of uric acid.  http://www.webmd.com/arthritis/colchicine-for-gout (last visited June 23, 2014).

[8]Naproxen is a nonsteroidal anti-inflammatory drug, used to treat pain or inflammation associated with any number of conditions, including gout. http://www.drugs.com/answers (last visited June 23, 2014).

and Medrol.[9]   He also prescribed a sling for his right arm and hand and discussed dietary reform relative to gout. ([8] at pp. 177-178).

On October 16, 2009, Mr. Parker went to the emergency room at Natchez Regional Medical Center with an ongoing problem, right wrist pain and swelling.  He reported that he had recently been to his primary care physician, who gave him medications for gout, but that he was "still" in severe pain.  ([8] at p. 115).   He described the pain as moderate and that nothing seemed to relieve it.  The ER doctor diagnosed gout and added a prescription for probenecid.[10]  He was to follow up with his primary care physician the following week.  ([8] at pp. 113-118).

On November 4, 2009, Mr. Parker underwent a psychiatric evaluation performed by Dr. David Powers.[11]  Dr. Powers opined that Mr. Parker had anxiety-related disorders that were not severe, with only mild limitations in social functioning and concentration, persistence or pace, that did not interfere with his ability to do routine work.  He referred to Dr. Young's records to substantiate his opinion.  ([8] at pp. 119-131).

Medical records from 2010 related to his claimed disability are minimal. Mr. Parker returned to Jefferson Health Center On January 21, 2010, needing a diabetes check-up and medication refill.  His blood pressure was 159/94, and his diagnoses were noted as diabetes

---

[9]Lorcet is a narcotic pain reliever used for moderate to moderately severe pain. http://www.rxlist/lorcet-drug.htm (last visited June 23, 2014), and Medrol is a steroidal drug used in the treatment of arthritis, among other things.  http://www.rxlist/medrol-drug.htm (last visited June 23, 2014).

[10]Probenecid is a uricosuric drug that increases uric acid excretion in the urine.  It is used to treat gout and hyperuricemia. http://en.wikipedia.org/wiki/Probenecid (last visited June 23, 2014).

[11]The evaluation was conducted as a result of a disability application.  Mr. Parker had previously applied for disability which was initially denied on December 9, 2009.  ([8] at p. 60).

mellitus, hypertension, gout/elevated uric acid and renal insufficiency with a BUN (blood urea nitrogen) of 28 and creatinine of 1.93.[12] ([8] at p. 176).  He also had a diabetes and blood pressure check up on August 17, 2010, at which time the physician's impression included "possible mental disorder."  She observed SAD affect, and prescribed Zoloft.[13] ([8] at p. 173). On October 11, 2010, during a routine check up and visit for medication refill, pain was noted in his left arm; and his blood pressure was 179/94.  ([8] at p. 170).

Dr. Sharon Scates conducted another psychiatric evaluation for the state on November 16, 2010.  She found that Mr. Parker had depression that did not precisely fit the diagnostic criteria, but that it was not severe.  In addition to the limitations previously noted by Dr. Powers, Dr. Scates determined mild limitations in activities of daily living.  Mr. Parker told her he was taking Xanax,[14] and her opinions were based upon what he reported.  ([8] at pp. 137-149).

He returned to Jefferson Health Center in Natchez on February 26, 2011, whereupon he was diagnosed with bronchitis and prescribed medications.  At that time chronic medications, listed in typewritten form, included: Accupril; allopurinol; colchesine; Crestor; lorcet; medrol;

---

[12]A medication was added, but it is illegible.  ([8] at p. 176).

[13]SAD is an acronym for Seasonal Affective Disorder, a type of depression that accrues at the same time every year.  http://www.mayoclinic.org/diseases (last visited June 27, 2014). "Affect" is a psychological term for an observable expression of emotion. http://www.mindisorders.com (last visited June 27, 2014).  Zoloft is an antidepressant prescribed not only for depression, but also for other psychological disorders including social anxiety. http://en.wikipedia.org/wiki/Sertraline (last visited June 27, 2014).

[14]Xanax is a brand name for alprazolam and is used to treat anxiety and panic disorders. Http://www.drugs.com/zanax.html (Last visited June 27, 2014).  Alprazolam was filled by Wal-Mart Pharmacy a number of times beginning on October 11, 2010, the day Jefferson Health Center refilled medications and conducted a brief examination, with no note of mental impairment.  ([8] at pp. 170 and 247).

metformin; metoprolol; and quinipril.[15]  In addition, he was taking 30 units of  insulin daily.  ([8] at pp. 168-169).

On April 11, 2011, he returned to the Natchez clinic with moderate to severe right arm and wrist pain, which had been present for about one month.  He described the pain as "throbbing" and "sharp" with "tingling sensation to his right hand and fingers."  He complained that the symptoms caused him difficulty in "grasping and picking up objects" and that they were affecting his "daily activities." ([8] at p. 165).  Physical examination revealed a normal upper extremity on inspection, but tenderness with palpation.  Range of motion was decreased in flexion, but there was no joint instability.  He was diagnosed with diabetes, pain in joint involving forearm and gouty arthopathy.  In addition to his regular medications, he was prescribed probenecid-colchesine for gout. His blood pressure was elevated at 168/88, and his hemoglobin A1c was slightly elevated at 7.6%.  ([8] at pp. 165-167).

A week later, on April 18, 2011, Dr. Moses Young[16] completed a series of opinion forms relative to Mr. Parker's condition.  First, in a Physical Capacities Evaluation, Dr. Young stated Mr. Parker could: occasionally lift five pounds; frequently lift one pound; sit and stand one hour each in an eight-hour work day; rarely push/pull, climb and balance, grasp/handle, use fine manipulation with fingers, reach, operate a motor vehicle and work around hazardous machinery;

---

[15]Accupril is a brand name of quinipril hydrochloride. http://www.pfizer.com/products (last visited June 23, 2014).  The entry of both medications is more than likely a reflection that he had been given both generic and brand name forms of the drug.  Crestor is for elevated cholesterol.  http://www.crestor.com (last visited June 23, 2014).  Metoprolol is used to treat hypertension.  http://www.drugs.com/metoprolol.html (last visited June 23, 2014).

[16]Dr. Young was Mr. Parker's primary treating physician at Jefferson Health Center in Fayette. (*See* [8] at pp. 171 and 151).

and occasionally bend, stoop and be exposed to environmental problems like dust.  He further

opined that Mr. Parker would more than likely be absent from work more than four days a

month.  He offered no basis for the stated restrictions.  ([8] at p. 159).

Second, a Clinical Assessment of Pain form included an opinion that pain would be

distracting to Mr. Parker's performance of daily work activities; and upon physical activity, the

pain would be greatly increased such that it could lead to a total abandonment of tasks.  In

addition, he said that medication side effects may create some limitations, but should not create

"serious problems."  ([8] at p. 160).

In addition, Dr. Young was asked to rate the degree of impairment ("Impairment Form")

upon abilities required for work.  Of the seventeen abilities listed, Dr. Young rated a "moderate"

impairment for eight of them and, "marked" impairment for seven of them.  He opined that Mr.

Parker's ability to complete a normal workday and workweek without interruptions was

"extreme[ly]" impaired, and that Mr. Parker had an "extreme" impairment regarding his ability to

respond to customary work pressures.  ([8] at pp. 161-162).

On June 9, 2011, Mr. Parker was discharged from Natchez Regional Medical Center with

diagnoses of malingering and hypertension, following a six-day hospital admission based upon

complaints of weakness and inability to stand, walk or talk.  ([8] at p. 197).  On presentation to

the emergency room, Mr. Parker was confused.  According to the deputy who transported him

from Adams County jail,[17] Mr. Parker had complained of headaches for two days, which were

getting progressively worse.  He was holding his head and crying in pain.  His blood pressure

was elevated, as were his BUN and creatinine levels; a head CT scan showed nothing acute.  ([8]

---

[17]He was incarcerated for not paying child support.  ([8] at pp. 266 and 283-286).

at pp. 202-205).  The admitting physician could not get him to talk or raise his arms and legs.

His initial impression was dementia, hysteria, hypertension and possible diabetes.  ([8] at pp.

199-200).  When the doctor later confronted him with suspected "fraudulent behavior," Mr.

Parker's functions returned.  ([8] at p. 197).  According to the discharging physician, Mr. Parker

"went on to show clear cut evidence" that he had functions he claimed not to have.  ([8] at p.

197).  He was treated for hypertension before being discharged to home; his medications were

hydralazine, Zestril, Microzide, Glucophage[18] and metoprolol. ([8] at p. 197).

Mr. Parker sprained his right ankle and went to Jefferson Health Center in Natchez on

July 18, 2011 for treatment.   His blood pressure was elevated that day at 178/102, and the record

implies that he had not been taking his medications.  He was instructed to take his medications

while in the clinic, and the notes reflect that the nurse practitioner observed him taking his blood

pressure medications.  He denied shortness of breath, chest pain, blurred vision and dizziness.

([8] at p. 163).

He followed up for medication refills at the clinic in Fayette on November 7, 2011.  He

communicated that his medical problems (listed as hypertension, diabetes mellitus, gouty

arthritis, hyperlipidemia and anxiety) were affecting his "daily activities," and that his symptoms

were most pronounced when he moved his "affected limb." ([8] at p. 188).  On physical motor

examination, his left arm was noted to be weak.  No specific treatment was ordered, but his

---

[18]Hydralazine is used to treat high blood pressure.  http://www.mayoclinic.org/drugs-supplements (last visited June 24, 2014).  Zestril (lisinopril) and Microzide (hydrochlorothiazide) are used in combination to treat high blood pressure.  Lisinopril relaxes blood vessels, while hydrochlorothiazide is a diuretic used to help lower blood pressure. http://www.mayoclinic.org/drugs-supplements  (last visited June 3, 2014). Glucophage is a brand name for metformin (antidiabetic drug).  *See, e.g.*,  http://en.wikipedia.org/wiki/Metformin (last visited June 24, 2014).

medications were refilled.   ([8] at p. 188).

He returned to the clinic on January 17, 2012, complaining of left side pain and right hand swelling.  The notes reference a visit to the Natchez Community Hospital on January 11, 2012,[19] because of moderate to severe pain and swelling to his right arm.  After receiving an injection and prescriptions for indomethacin[20] and lortab, he claimed the swelling and pain had somewhat diminished.  However, he said the problem was affecting his "daily activities" and that his symptoms were most pronounced when grasping objects. ([8] at p. 191).   In addition, he maintained his pain was moderate to severe.  ([8] at p. 191).   Objective examination revealed swelling, tenderness and limited range of motion in his right hand but no joint instability.  ([8] at p. 191).  Labwork showed elevated BUN, creatinine, cholesterol, triglycerides and uric acid.  In addition, the test for rheumatoid arthritis showed elevated levels.  ([8] at pp. 193-196).  His glucose level was normal, and his hemoglobin A1c was 7.1%.  ([8] at p. 194).  His noted history included "diabetes mellitus without mention of complication . . . not stated as uncontrolled," "malignant" hypertension, and to "essential" hypertension.[21]   ([8] at p. 191).  He was sent home with directions to continue his medication regime and low purine diet.  Dr. Young prescribed

---

[19]No January 11, 2012, records from the hospital are in the Court record.

[20]Indomethacin in a nonseroidal anti-inflammatory drug used to treat gouty arthritis and rheumatoid arthritis, among other things.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681027.html (last visited June 24, 2014).

[21]Malignant hypertension is high blood pressure with acute impairment of one or more organ systems, including the renal system, which can result in irreversible organ damage. http://en.wikipedia.org/wiki/Hypertensive_emergency (last visited June 24, 2014).  Essential hypertension refers to basic high blood pressure from an unknown cause.  *E.g.*, http://www.nhlbi.nih.gov/health//dci/Diseases/HBP_Othe/HrNames.html (last visited June 24, 2014).

allopurinol at the same dosage, indomethacin and probenecid-colchicine.  Mr. Parker was to return in four weeks.  ([8] at p. 192).

At the hearing before the ALJ on March 5, 2012, Mr. Parker complained that his right hand was still swollen and impairing his ability to lift.  In addition, gout was bothering his right leg and big toe.  He had pain in his left side, and both feet were tender.  ([8] at pp. 268 and 275-267).  He testified that he had "gout attacks" every 20-25 days that did not require physician intervention because they usually resolved with medication in about three days.   According to his testimony, the right hand issue that had been bothering him for a couple of months was the worst he had experienced.  ([8] at pp. 277-278).  He implied that the problem may not have been gout and that he was scheduled to see Dr. Young for a follow up about his right hand on March 19, 2012.[22]  ([8] at p. 279).  Dr. Young's records were not updated prior to the ALJ's decision.  However, the ALJ required the Plaintiff to produce his prescription records from Wal-Mart Pharmacy before she rendered her decision.  ([8] at p. 288).

## BURDEN OF PROOF

In *Harrell v. Bowen*, the Fifth Circuit detailed the shifting burden of proof that applies to disability determinations:

> An individual applying for disability and SSI benefits bears the initial burden of proving that he is disabled for purposes of the Social Security Act.  Once the claimant satisfies his initial burden, the [Commissioner] then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and therefore, not disabled.  In determining whether or not a claimant is capable of performing substantial gainful activity, the [Commissioner] utilizes a five-step sequential procedure set forth in 20 C.F.R. § 404.1520(b)-(f) (1988):

---

[22]Mr. Parker had not followed up four weeks after his appointment in January, as Dr. Young had recommended.  ([8] at p. 288).

12

1.  An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.

2.  An individual who does not have a 'severe impairment' will not be found to be disabled.

3.  An individual who meets or equals a listed impairment in Appendix 1 of the regulations will be considered disabled without consideration of vocational factors.

4.  If an individual is capable of performing the work he has done in the past, a finding of 'not disabled' must be made.

5.  If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed.

862 F.2d 471, 475 (5th Cir. 1988).  The claimant bears the burden at the first four steps, but the burden thereafter shifts to the Commissioner at step five. Once the Commissioner makes the requisite showing at step five, the burden shifts back to the claimant to rebut this finding.  *Perez v. Barnhart,* 415 F.3d 457, 461 (5th Cir.2005).  A finding that a claimant "is disabled or not disabled at any point in the five-step process is conclusive and terminates the . . . analysis." *Harrell,* 862 F.2d at 475 (citations omitted).

## ADMINISTRATIVE LAW JUDGE'S ANALYSIS

On June 18, 2012, after considering the testimony given at the March 5, 2012, hearing along with the medical and other records submitted, including pharmacy records received after the hearing ([8] at p. 247-249), the ALJ rendered her decision that Plaintiff was not disabled. ([8] at pp. 12-22).  The ALJ determined that Plaintiff met the insured status requirements of the Social Security Act though December 31, 2014.

The findings at the first three steps are not challenged.  At step one of the evaluation

13

process,[23] the ALJ found that Plaintiff had not engaged in any substantial gainful activity since March 1, 2009.  At step two,[24] the ALJ found that Plaintiff suffered from the following severe impairments: gout; hypertension; diabetes mellitus; anxiety; and obesity.[25]  ([8] at p. 17).  At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).  ([8] at p. 17).

To make a determination at step four, the ALJ assessed Plaintiff's Residual Functional Capacity ("RFC").[26]  The ALJ found that:

> the [C]laimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: he requires the option to walk around briefly (no more than five minutes) after sitting for thirty minutes, and to sit briefly after standing or walking for thirty minutes; and he is limited to performing only simple, routine, repetitive tasks.

([8] at pp. 18-19).  According to the ALJ, in making this finding, she considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the

---

[23] The ALJ applied the evaluation process set forth in 20 C.F.R. §§ 404.1520(b) and 416.920(b).

[24] The ALJ applied the evaluation process set forth in 20 C.F.R. §§ 404.1520(c) and 416.920(c), as well as §§ 404.1521 and 416.921, and Social Security Rulings ("SSRs") 85-28, 96-3p and 96-4p.

[25] Although Plaintiff did not include obesity as one of the grounds for disability, his medical records substantiate a finding of obesity.  (*See, generally*, [8] at pp.168-208 (e.g., BMI 32.6, p. 168; "problem list" includes a diagnosis of "overweight and obesity," p. 191)). Defendant has not challenged that finding.

[26] "Residual Functional Capacity" is defined in the Regulations as the most an individual can still do despite the physical and/or mental limitations that affect what the individual can do in a work setting. 20 C.F.R. §§ 404.1545 and 416.945.

objective medical evidence and other evidence and also considered opinion evidence.[27] ([8] at p. 19). With regard to the opinions of Dr. Young, the ALJ addressed Dr. Young's Physical Capacities Evaluation, Clinical Assessment of Pain and Impairment Form, dated April 18, 2011, noting moderate to extreme work functioning limitations. She found that the limitations Dr. Young expressed therein were not supported by his own "relatively minimal" clinical findings reflected in his treatment notes, which documented no motor strength limitations and some, but not "persistent or pronounced" range of motion limitations and swelling. ([8] at p. 20). Accordingly, she afforded his opinion "little weight," as inconsistent with the preponderance of the evidence in the medical records themselves. ([8] at p. 20).

Further, at step four, the ALJ found that Plaintiff was not capable of performing any past relevant work.[28] However, at step five of the evaluation process, the ALJ, in "considering the [C]laimant's age, education, work experience residual, and functional capacity," found that jobs existed in significant numbers in the national economy that the Plaintiff could perform.[29] ([8] at p. 21). Accordingly, the ALJ found that Plaintiff was not disabled as defined by the Social Security Act. ([9] at p. 22).

## STANDARD OF REVIEW

This Court's review of the Commissioner's decision is limited to inquiry into whether there is substantial evidence to support the Commissioner's findings and whether the correct

---

[27] 20 C.F.R. §§ 404.1529, 416.929 and SSRs 96-4p and 96-7p; 20 C.F.R. §§ 404.1527, 416.927 and SSRs 96-2p, 96-5p, 96-6p, and 06-3p.

[28] 20 C.F.R. §§ 404.1565 416.965.

[29] 20 C.F.R. §§ 404.1569, 404.1569(a), 416.969 and 416.969(a).

legal standards were applied in evaluating the evidence. *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988).  Substantial evidence is "more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hames v. Heckler,* 707 F.2d 162, 164 (5th Cir. 1983).   To be substantial, the evidence "must do more than create a suspicion of the existence of the fact to be established." *Id*. (citations omitted).  However, "[a] finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision." *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001) (internal citations and quotations omitted).  Conflicts in the evidence are for the Commissioner, not the courts, to resolve.  *Selders v. Sullivan,* 914 F.2d 614, 617 (5th Cir. 1990).  A court may not reweigh the evidence, try the issues *de novo*, nor substitute its judgment for the Commissioner's, "even if the evidence preponderates against" the Commissioner's decision. *Harrell*, 862 F.2d at 475.  If the decision is supported by substantial evidence, it is conclusive and must be affirmed.  *Selders,* 914 F.2d at 617.  Moreover, "'[p]rocedural perfection in administrative proceedings is not required' so long as 'the substantial rights of a party have not been affected.'" *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007) (quoting *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir.1988)).

## ANALYSIS

Plaintiff brings this action, arguing that the ALJ erred in making her determinations and the Acting Commissioner erred in accepting those determinations.  Plaintiff's arguments for reversing the Acting Commissioner's final decision are discussed below.

### Issue No. 1:    *Whether the ALJ properly evaluated the treating physician's opinion*

The Plaintiff argues that the ALJ erred by not applying six factors in her analysis of the

16

weight she assigned to the opinions of Dr. Moses Young.  She specifically asserts that because

the six factors as set forth in 20 C.F.R. §§ 404.1527 and 416.927 were not included in her

analysis, the case should be reversed and remanded for further consideration.  ([9] at p. 12).

Ordinarily, the opinions of a treating physician who is familiar with a claimant's

treatments, injuries and responses should be accorded considerable weight in determining

disability.  *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).  However,

> [t]here are exceptions to this principle. The ALJ may give less weight to a treating
> physician's opinion when "there is good cause shown to the contrary," as is the
> case when his statement as to disability is "so brief and conclusory that it lacks
> strong persuasive weight," is not supported by medically acceptable clinical
> laboratory diagnostic techniques, or is otherwise unsupported by the evidence.
> The ALJ may also reject a treating physician's opinion if he finds, with support in
> the record, that the physician is not credible and is "leaning over backwards to
> support the application for disability benefits." The administrative fact finder is
> entitled to determine the credibility of medical experts as well as lay witnesses
> and to weigh their opinions and testimony accordingly.

*Id.* at 485 (citations omitted).

Plaintiff cites *Newton v. Apfel*, 209 F.3d 448, 456 (5th Cir. 2000) for the proposition that

the ALJ must address six factors[30] when he determines not to give a treating physician's opinion

controlling weight.  The undersigned finds that the ALJ made no error because there was

substantial evidence in the record to support her conclusion that Dr. Young's opinions were not

supported by "medically acceptable clinical laboratory diagnostic techniques," and was otherwise

"unsupported by the evidence."  *See Scott*, 770 F.2d at 485.

As an initial matter, the undersigned notes that Dr. Young merely completed three forms

---

[30]20 C.F.R. §§ 404.1527(c) and 416.927(c) factors are:  (1) examining relationship; (2)
treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other
factors.

submitted to assist the Social Security Administration in making its determination.  Although Dr.

Young checked off boxes, and circled numbers and words in multiple choice fashion, he

neglected to explain the basis for the restrictions he indicated as requested in question 6 on the

Physical Capacities Evaluation form.  ([8] at p. 159).  In other words, he never gave a reason for

his opinions.  While this alone could be enough to render his opinions so brief and conclusory as

to discount the weight afforded them and thereby avoid the six-factor analysis,[31] the ALJ

nevertheless pointed to Dr. Young's own records for explanation.   In reaching her decision, the

ALJ factored in not only the medical records presented, but also the Claimant's pharmacy

records.

The medical records themselves reveal very little with regard to his anxiety and obesity

impairments.[32]  However, Dr. Young opined that Mr. Parker's psychologically-based symptoms

were extreme, such that they impaired his ability to complete a normal workday and workweek.[33]

Nothing in Dr. Young's records reference any type of psychologically-based impairments.  At

best, his anxiety caused occasional headaches, first noted on April 21, 2009.

Mr. Parker became insulin dependent for diabetes on April 21, 2009[34], and his diabetes

---

[31]*See Scott*, 770 F.2d at 485.

[32]The ALJ addressed these impairments in her opinion, referring primarily to the opinions of the two psychologists who found Mr. Parker was not severely affected by anxiety, and that the evidence in the record did not support the presence of obesity factors as limiting upon a light range of work.  ([8] at p. 20).

[33]Questions 8-17 on the Impairment Form address mental impairments, which Dr. Young said were mostly "marked" impairments, a few "extreme," with the only "moderate" impairment being his ability to understand, remember and carry out complex instructions. ([8] at p. 162).

[34]The undersigned observes that during this time, Mr. Parker, a married man, was in the process of losing the job he had held for approximately twenty years due to impregnating a co-

remained well controlled thereafter.  The medical records show that hypertension was a source of greater medical problems, but nothing in Dr. Young's records indicate that it was so severe that it created limitations in his ability to function on a daily basis.

The only evidence in the medical records suggesting that Mr. Young sustained limitations to his ability to work are related to his gout problems.  Even these references are few and far between.  On February 19, 2009, Mr. Parker's ankle was tender and swollen; but no limitations were noted.  In September and October, 2009, his right arm was causing enough pain that a sling was required.  However, after receiving additional medication from the emergency physician, with orders to follow up with Dr. Young in one week, the record falls silent.  The next instance recorded was on October 11, 2010, one year later, relative to pain in his left arm.  No limitations were noted in the record.  Decreased range of motion in flexion in his right arm was determined as a result of gout six months later, on April 11, 2011.  Dr. Young rendered his opinions the following week.

Two months later, Mr. Parker was diagnosed with malingering.  The medical records indicated two more incidents, one on November 7, 2011 involving his left arm being weak, no limitations noted.  The final incident[35] began in January 2012 regarding his right arm, and objectively, limited range of motion was found.  Mr. Parker did not follow up in February as directed, but still complained of swelling during the March 2012 hearing.

Thus, the ALJ had the benefit of evidence in the record concerning: right arm pain

---

worker.

[35]In his Brief, Plaintiff also refers to a physician visit on July 18, 2011, at which time he needed a cane, claiming gout as the culprit.  ([9] at p. 15).  However, he admittedly sprained his ankle, and the nurse practitioner diagnosed a sprained ankle.  ([8] at pp. 163-164).

causing impairment in September-October 2009, which was relieved with different medication; and limited range of motion in his right arm on April 2011, and again in January 2012. Considering Mr. Parker's assertion that the gout was more problematic than the medical records indicated, she requested and reviewed the pharmacy records to track his gout prescription refills. She observed, "Pharmacy records received after the hearing indicate that [Mr. Parker] does not take the medications prescribed for gout on the recommended schedule, a fact that the undersigned finds to indicate that his complaints are not as [sic] limiting as he would have them appear."  ([8] at p. 20).

The ALJ referred to a record from Natchez Regional Medical Center on October 16, 2009, which states that Plaintiff's symptoms from diabetes, hypertension and gout were generally well-controlled when he was compliant with his medications.  ([8] at p. 19).  On review of the record as a whole, she found that the evidence did not support a finding of "continuing/persistent limitations of use of hands."  ([8] at p. 19).  She further found that the evidence did not support a finding of any need for more than normal work breaks with regard to swelling in his legs as he claimed.  ([8] at p. 19).

There is substantial evidence throughout the record as a whole to support the ALJ's decision to discount the opinions of Dr. Young, and the undersigned finds no error in her decision not to apply the six factors referenced in 20 C.F.R. §§ 404.1527 and 416.927. Summarily, Dr. Young's opinions were not supported by the record.   For example, nothing in the medical records supports an opinion that Mr. Parker would need to miss more than four days a month due to physical incapacities.

**Issue No. 2:**     ***Whether the ALJ improperly relied on vocational testimony***

20

Plaintiff submits that the ALJ did not posit a complete hypothetical to the vocational expert.  Therefore, he argues that the ALJ erred when she rendered her decision, because she relied on the VE's answer to an incomplete questions, so the case should be reversed and remanded.  ([9] at pp. 20-21).

The question at issue required the VE to assume that the hypothetical plaintiff could perform a light range of work, but would be required to sit for "a few" minutes after standing and walking for thirty minutes, and would need to be given the option to stand and move about "briefly" after sitting for thirty minutes, and was further limited to simple, routine, repetitive tasks.  ([9] at p. 22 (citing [8] at p. 292-293)).  In her decision, the ALJ determined the RFC based upon the same description used in the hypothetical question, but changed "a few" to "briefly," followed by a parenthetical which read "no more than five minutes." ([9] at p. 21 (citing [8] at pp. 18-19)).  Plaintiff suggests that by not defining "a few" to mean "briefly," which meant no more than five minutes, the opinion given by the VE in answer to the hypothetical question was meaningless. ([9] at pp. 20-22).

A hypothetical question must reasonably incorporate all of a claimant's limitations recognized by the ALJ.  *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).  The hypothetical question posited to Ms. Burg certainly met the first criterion.  Moreover, a claimant must be afforded the opportunity to correct perceived deficiencies in the ALJ's questions.  *Id.*  Ms. Burg was tendered to counsel for Mr. Parker, who did in fact question Ms. Burg following the hypothetical questions from the ALJ.  ([8] at pp. 295-296).   Thus, Mr. Parker's attorney was afforded the opportunity and could have explored the meaning of "a few" if she so desired.

Finally, "[p]rocedural perfection in administrative proceedings is not required' so long as

'the substantial rights of a party have not been affected.'" *Audler*, 501 F.3d at 448 (quoting *Mays*, 837 F.2d at 1364).  This precept has been applied in at least one instance wherein an ALJ did not set a specific time limit for the sit/stand option in his hypothetical questions to the vocational expert.  *Charles v. Astrue*, 291 F. App'x 552, 554, n. 3 (5th Cir. 2008) (citing *Mays*, 837 F.2d at 1364)*.*  The *Charles* court dismissed the point because the plaintiff had not argued how the alleged failure adversely affected his substantial rights.  *Id.*

Here, Mr. Parker has not shown how failing to define "a few" or "briefly" adversely affected his substantial rights.  Accordingly, the undersigned finds that the substantial rights of the Plaintiff were not affected by the ALJ's  failure to define a common phrase to a vocational expert, a phrase commonly understood as evidenced by counsel's failure to posit questions about its meaning or understanding.

### Issue No. 3:     Whether the ALJ erred by not considering Mr. Parker's case as a borderline case

Plaintiff next argues that the ALJ erred by employing a mechanical application of the Medical-Vocational Guidelines ("Grid Rules") when Mr. Jackson was actually in a borderline situation.  The Social Security Regulations state:

> When we make a finding about your ability to do other work under § 404.1520(f)(1), we will use the age categories in paragraphs (c) through (e) of this section.  We will use each of the age categories that applies to you during the period for which we must determine if you are disabled.  We will not apply the age categories mechanically in a borderline situation.  If you are within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that you are disabled, we will consider whether to use the older age category after evaluating the overall impact of all the factors in your case.

20 C.F.R. § 404.1563(b).

Mr. Parker was fifty-four years old at the time of the hearing and at the time of the ALJ's decision on June 18, 2012.  He turned fifty-five approximately six months later, on December 26, 2012.  The Appeals Council denied review on February 4, 2013, when Mr. Parker was fifty-five years old.

The ALJ applied Grid Rule 202.11 to Mr. Parker in her decision.  ([8] at p. 22).  Grid Rule 202.11 applies to individuals who are capable of light work, who are closely approaching advanced age (defined as 50-54 years old)[36], who have less than a high school education, and whose previous work experience skills (skilled or unskilled) are not transferable.  A person who meets the criteria for this section of the grid is not considered disabled.  20 C.F.R. Pt. 404, Sbpt. P, App. 2 § 202.11.

The Plaintiff argues that because he was to turn fifty-five years old (a person of advanced age)[37] six months after the ALJ's decision, he was in a "borderline situation," requiring the ALJ to consider whether or not to apply Grid Rule 202.02.  The current work capability (light), education and work experience criteria are the same under Grid Rules 202.11 and 202.02.  The difference turns on the age category, which affects the outcome. A person who "grids out" under Rule 202.02 is deemed disabled.  *Id*. at § 202.02.

The Defendant does not argue that the outcome would have been different had rule 202.02 been applied.  Thus, the issues for the Court to decide are whether Mr. Parker was in a "borderline" situation, and if so, whether the ALJ and Commissioner considered that in their decision and denial of review, respectively.  For the reasons articulated below, the undersigned

---

[36]20 C.F.R. § 404.1563(b).

[37]20 C.F.R. § 404.1563(c).

recommends that the case be remanded because Mr. Parker should have been in a borderline

situation and the final decision does not reflect consideration of that issue.

"Although neither the Secretary nor the courts have yet defined what set of circumstances

will give rise to a 'borderline situation,'the Secretary is 'vested with considerable discretion in

this application.'" *Walhood v. Secretary of Health and Human Services*, 875 F.Supp 1278, 1284

(1995) (review under 42 U.S.C. § 405(g) for denial of widow's disability insurance benefits)

(quoting *Underwood v. Bowen*, 828 F.2d 1081(5th Cir. 1987)).  As stated another way by the Fifth

Circuit Court of Appeals, "[T]he absence of a definition indicates the Commissioner has

significant discretion to determine when a situation is borderline." *Stanridge-Salazar v.*

*Massanari*, 254 F.3d 70 (5th Cir. 2001) (citing *Harrell*, 862 F.2d at 479).

However, guidance is found in "case authority indicating that the relevant age is that

which the plaintiff has attained at the time of the court's decision," if the plaintiff is still insured

at that time.  *Walhood,* 875 F.Supp. at 1284 (citing *Varley v. Secretary of HHS*, 820 F.2d 777 (6th

Cir. 1987)).  Therefore, when a plaintiff will "remain insured while attaining a vocationally

significant age after the date of the Secretary's decision," the circumstances should give rise to a

"borderline situation." *Id*.  Further, there has been more recent development in determining a

timeline within which to address a borderline situation.  As a general rule, a person who is within

six months of the next higher age category is considered to be in a borderline situation. *Stout v.*

*Astrue*, 2012 WL 1020179 at *10 (E.D.La. Feb. 22, 2012), adopted, 2012 WL 1020174 (E.D.La.

Mar. 26, 2012) (citing *Florent v. Astrue*, 2010 WL 2977617 at *11 n.5 (E.D.La. Jun. 17, 2010)),

adopted, 2010 WL 2978224 (E.D.La. Jul. 20, 2010); *see also, Manning v. Colvin*, 2014 WL

266417 at *4 (N.D.Tex. Jan. 24, 2014) (emerging consensus that six-month period presents

general rule of thumb for defining borderline situations; distinguishing *Underwood,* 828 F.2d at 1081, and *Harrell*, 862 F.2d at 471, because applying the next age category would have made no difference in the outcome).

The ALJ found that Mr. Parker will be insured through December 31, 2014. He was therefore insured at the time of the ALJ's decision on June 18, 2012, at which time he was fifty-four years and six months old, and within six months and one week of reaching his fifty-fifth birthday. He remained insured at the time he turned fifty-five on December 26, 2012, and at the time the ALJ's decision became the "final decision of the Commissioner of Social Security" on February 4, 2013. (*See* [8] at p. 7). Given these facts, the undersigned finds that Mr. Parker was in a "borderline" age category.

When a borderline situation is presented, an ALJ must consider whether to apply the next age category. *Stout*, 2012 WL 1020179 at *10 (citing 20 C.F.R. § 404.1563(b)). The record must contain enough of an explanation of the issue that a reviewing court is able to determine if the ALJ's decision is supported by substantial evidence. *Id*. This can be accomplished by a simple reference to the fact that the borderline age issue was considered by either the ALJ or the Acting Commissioner. *Id*. (citation omitted). Absent such an overt statement, if the decision references the Plaintiff's age at the time of the hearing or his age at the time of the decision, there may be enough evidence to establish that a borderline age situation was considered. *See Manning*, 2014 WL 266417 at *7 (ALJ's finding at step four regarding claimant's birth date and his age at the time of alleged onset deemed insufficient to establish that ALJ considered the borderline issue).

Neither the ALJ nor the Acting Commissioner in Mr. Parker's case made any reference to

25

the borderline issue.  In addition, like the ALJ's decision in *Manning*, the decision in Mr.

Parker's case made no reference to his age on the date of the hearing or on the date of the

decision.  The ALJ found that "the [C]laimant was born on December 26, 1957 and was 51 years

old, which is defined as an individual closely approaching advanced age, on the alleged disability

onset date." ([8] at p. 21).  There is no other reference to his age in her opinion. ([8] at pp. 12-

22).

    Alternatively, the ALJ's reliance on testimony from the VE "in assessing the overall

impact of the factors of a claimant's case will typically suffice."  *Stout*, 2012 WL 1020179 at *10

(citing *Lockwood v. Comm. of Soc. Sec. Adm.*, 616 F.3d 1068, 1071-72 (9th Cir. 2010), *cert.*

*denied* . ___ U.S. ___, 131 S.Ct. 2882 (2011)).  However, the VE must have considered the

"specific age" of the Plaintiff at the time he is testifying.  *Compare Id. with Singleton v. Astrue*,

2013 WL 460066 at *9 (N.D.Tex. Feb.7, 2013) (VE "specifically" told that plaintiff was 54 years

old when asked to consider whether he could perform other jobs).

    In the instant matter, the ALJ asked the VE to assume an "individual who is closely

approaching advanced age" in each of the hypothetical questions presented relevant to whether

the hypothetical person could perform other work besides Mr. Parker's past occupations. ([8] at

pp. 292-295).  "Closely approaching advanced age" means 50-54 years old.  20 C.F.R. §

404.1563(b).  The VE was not asked to consider the work capability of a person who was

specifically 54 years old or six months shy of being advanced in age.

    The undersigned concludes that there is not enough evidence to determine whether the

ALJ considered the borderline issue.  District Courts in the Fifth Circuit have held that in cases

where there is "no explanation of the issue and there is an indication that the claimant might be

considered disabled under a different [Grid Rule], a remand is proper." *Manning*, 2014 WL 266417 at *6. Accordingly, the undersigned recommends that this matter be remanded for consideration of the borderline age issue.

## CONCLUSIONS AND RECOMMENDATIONS

Based on the foregoing, the undersigned finds that the Commissioner's decision supported by substantial evidence and utilizes correct legal standards regarding the issues of whether the treating physician's opinion was properly evaluated and whether the ALJ properly relied on the VE's opinion. However, the undersigned finds that issue borderline age situation needs to be addressed. It is, therefore, the recommendation of the undersigned that Defendant's Motion for an Order to Affirm the Decision of the Commissioner [10] be granted in part and denied in part, with the final decision of the Acting Commisioner to Affirmed in part and Remanded in part, consistent with this opinion.

## NOTICE OF RIGHT TO OBJECT

In accordance with the rules, any party within fourteen days after being served a copy of this recommendation, may serve and file written objections to the recommendations, with a copy to the Judge, the Magistrate Judge and the opposing party. The District Judge at the time may accept, reject, or modify in whole or part, the recommendations of the Magistrate Judge, or may receive further evidence or recommit the matter to this court with instructions. The parties are hereby notified that failure to file written objections to the proposed findings, conclusions, and recommendations contained within this report and recommendation within fourteen days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions accepted by the district court to

which the party has not objected.  *Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1428-29

(5th Cir. 1996).

      THIS the 30th  day of June, 2014.

s/ Michael T. Parker
_____
United States Magistrate Judge
